# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

—o0o—

| | |
|---|---|
| YANG LO, a.k.a. JOHNNY YANG, | ) 1:02-CV-06087 LJO JMD (HC) |
| Petitioner, | ) FINDINGS AND RECOMMENDATION |
| v. | ) REGARDING PETITION FOR WRIT OF |
| | ) HABEAS CORPUS |
| ANTHONY LaMARQUE, Warden, | ) [Doc #1] |
| Respondent. | ) |

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. This action has been referred to this court pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72-302.

PROCEDURAL HISTORY

Petitioner is currently in the custody of the California Department of Corrections pursuant to a judgment of the Superior Court of California, County of Fresno, entered on November 12, 1998. *See* Respondent's Answer to Petition of Writ of Habeas Corpus, Ex. G (Abstract of

Judgment).[1]  Following a jury trial, Petitioner was found guilty of: ten counts of forcible lewd and lascivious conduct with a child under the age of fourteen; six counts of rape in concert; two counts of false imprisonment; and one count of forcible sodomy in concert.

Thereafter, Petitioner timely appealed his conviction and sentence to the California Court of Appeal, Fifth Appellate District, (hereinafter "5th DCA").  On August 9, 2001, the 5th DCA affirmed the conviction.  Ex. D.  Petitioner subsequently filed a Petition for Review in the California Supreme Court.  Said petition was denied on November 14, 2001.  Exs. E and F.

On September 6, 2002, Petitioner timely filed the above-captioned federal habeas petition, alleging that the trial court's comments to the jury during deliberations had amounted to coercion in violation of Petitioner's Due Process rights under the United States Constitution.  Ex. G at 3.  On March 5, 2003, Respondent filed an answer to the petition.

## FACTUAL BACKGROUND

The Court adopts the facts as summarized by the 5th DCA in its opinion dated August 9, 2001:

> On April 5, 1998, a Sunday night, 14-year-old Maney asked her friends, Kia (12 years old) and Kaoying (13 years old), to go cruising with her ex-boyfriend, Sim, and some friends. The girls joined a carload of young men, which eventually included Money (driving), Sim, Lor, Boomy, Xee and Heavy, all members of the Mongolian Boys Society (MBS) gang.  After driving around for awhile, Money parked at a Motel 6.  Someone told the girls to get out of the car and go to room 115.  The girls entered room 115 and saw that more men were there, including MBS members Bolo and Bubbles.
> Later that night, Kia saw Maney taken into the bathroom by Bolo.  Maney was in the bathroom with Sim and Bolo when Bolo confronted her for allegedly "'talking shit'" about the MBS.  She denied doing so, and Sim attempted to defend her.  Sim and Bolo agreed to resolve the dispute by arm wrestling.  If Sim lost, he would allow Bolo to "pimp" the girls.  Bolo was the "shot caller" in the gang.  Sim lost the arm wrestling match because Bolo was larger.  Four men raped Maney during this time, before midnight.  Between the rapes, Maney observed the men paying money to Bolo.  After a short while, Money raped Maney in the bathroom.
> Kaoying was raped next.  Xee pulled Kaoying into the bathroom where there was a blanket on the floor.  Xee, Money, Gangster, and Bubbles then raped Kaoying.  Kaoying tried to get out of the bathroom after Money raped her, but could not do so.
> Lu Vang (Louie) had come to the motel room shortly after midnight with Xee and Bubbles.  There were 10 to 15 people inside, including three girls – Maney, Jennifer, and one whose name he could not remember (Kia).  Louie saw men going in and out of the bathroom.  Shortly after arriving, he entered the bathroom and found Kaoying, crying.  Louie asked what was wrong.  Kaoying told him she had been raped.  Louie was afraid of the other men and said he could not take her home.  He stayed in the bathroom with Kaoying for awhile and then went

---

[1] All subsequent Exhibit references are to the exhibits attached to Respondent's Answer, unless otherwise noted.

home, leaving Bubbles at the motel.

At some point Louie saw Kia having sex with someone in the hallway by the closet next to the bathroom, and assumed they were boyfriend and girlfriend. The other men in the room were standing around teasing, making jokes and throwing ice on them.

According to Kia, the gang told her that if she did not agree to have sex with Lor, she would be forced to have sex with all the men. Kia agreed to avoid the greater evil, and had sex with Lor on the floor as the others looked on. During this time, Kaoying was being raped in the bathroom. Kaoying later came out and was crying by the bathroom door. Kia, who had just had sex with Lor, told Kaoying to stop crying or Heavy was going to hit her. At this point, Kia was pushed into the bathroom.

Six men, including Nippy, Money, Bolo, Bubbles, defendant, and a man she did not know by name, raped Kia. The rapes were committed in two groups several hours apart. Kia could not recall specific details or an order, but Nippy followed Lor, and the man whose name she did not know was last. When Kia was pushed into the bathroom, Nippy told her to take off her clothes. When she refused, Nippy threatened that the gang would kill her. Kia complied, and Nippy copulated her mouth and then raped her on the floor. Someone else came into the bathroom after Nippy was done, but Kia could not recall who it was. Money, Bolo, Bubbles and defendant sexually assaulted her after she attempted to escape through a window. Sim and others threatened that the girls would be taken to Washington, pimped and killed if they did not cooperate. Bolo made Kia get on top of him while Money had her perform fellatio on him at the same time. Money also raped her and Bolo copulated her mouth twice; once in the bathroom and again outside the bathroom. Money also copulated Kia's mouth outside the bathroom. At some point in the bathroom, Bolo committed sodomy on Kia despite her plea to be left alone. This caused her to scream loudly.

Defendant raped Kia in the bathroom. He then copulated her mouth in the shower. Afterward, defendant raped Kia on the floor again. During this time, defendant punched Kia's arm. Bubbles entered the bathroom after defendant and raped Kia. Bubbles also put his penis between Kia's breasts and "breast fucked" her. Kia left the bathroom after Bubbles raped her.

Sometime on Monday a maid came to clean the room. A man opened the door and asked for clean towels. The maid gave him clean towels in exchange for wet ones. The dirty towels had blood spots on them.

Monday evening, after Kia was in the bathroom for the second time, Bolo came to Kaoying and told her to have sex with Diamond, who stood a few feet away. She refused and asked Bolo to take her home. Bolo said he would take her home if she had sex with Diamond. Diamond took Kaoying into the bathroom and raped her. Afterward, defendant went into the bathroom and raped her. Kaoying kept fighting defendant off until he told her to take a shower with him, promising nothing else would happen. In the shower, defendant tried to get Kaoying to bend over ,but she refused. Defendant then copulated Kaoying's mouth.

Efforts by the girls to leave the motel room were thwarted. Someone was always sitting in a chair guarding the door and would not let them out. Once, when Maney tried to run out the door, she was grabbed by the neck and threatened with a screwdriver. On another occasion the three girls kicked out a window screen and tried to go out the window, but the men prevented them from escaping.

Around 6:00 p.m. on Monday evening, Louie returned to the motel room to see if Kaoying was still present. All three girls were there, as well as five to ten men. Kaoying approached Louie and they went into the bathroom, where Kaoying again told him she wanted to go home and gave him her phone number. As they talked, Kia and Maney joined them in the bathroom and asked Louie to call their parents. Louie memorized Maney's telephone number and left. After thinking about it and weighing the pros and cons, Louie called Maney's house. He told Maney's brother where the girls were located.

After Louie left, Kia pretended to faint, hoping the men would leave them alone because they had not slept. When she did so, most of the men left , except for defendant, Sim, Money and Xee. Kia was placed on the bed and Kaoying fell asleep next to her. Kaoying awoke and heard Sim talking with others about pimping the girls and taking them to Spokane, Washington. Defendant told Maney to go to room 116 and have sex with two men. Sim and Xee told Kaoying

that if the girls would have sex with four or five older men from room 116, they would take them home and not allow them to be transported to Washington.

At this point, despite their protestations, Kia, Maney and Kaoying were each raped by men from room 116. One man, identified as codefendant Tou Xiong, chose Maney and raped her in a bed in room 116. Another man raped Kia in the bathroom of room 116. A third man raped Kaoying in the closet area outside the bathroom of room 115.

Eventually the three girls were back in room 115 standing together. Sim told Maney there were two more men and that would be all. None of the girls wanted to have sex with these men, and as they debated who should do it, the police knocked on the door.

When the police arrived at about 12:30 a.m. Tuesday, only Sim, Xee, and Money were in room 115 with the girls. Defendant ran into room 116 because he did not have his pants on. The girls did not tell the police what had happened because they were afraid the perpetrators who had left the room earlier would come after them. They also felt ashamed and did not want their parents to know.

Defendant's pants were on the floor and his wallet was in the pants pocket. While the police were talking to Sim, Xee, and Money outside, the girls discussed what they were going to say and concocted a story about being in Visalia. Maney took defendant's wallet, which contained his identification. Subsequently, Maney's father came to the motel and picked up the three girls.

## DISCUSSION

I. **Jurisdiction**

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 fn. 7 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution. In addition, the conviction challenged arises out of the Fresno County Superior Court, which is located within the jurisdiction of this Court. 28 U.S.C. § 2254(a); 2241(d). Accordingly the Court has jurisdiction over this action.

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997), *cert. denied*, 522 U.S. 1008 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997), *quoting* Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir. 1996), *cert. denied*, 520 U.S. 1107 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320 (1997) (holding AEDPA only applicable to cases filed after its enactment). The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

4

## II.  Standard of Review

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a state court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C . § 2254(a).

The instant petition is reviewed under the provisions of the AEDPA.  Lockyer v. Andrade, 538 U.S. 63, 70 (2003).  Under the AEDPA, a petition for habeas corpus will not be granted unless the adjudication in question "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding."  28 U.S.C. § 2254(d); *see* Lockyer, 538 U.S. at 70-71; Williams, 529 U.S. at 413.

As a threshold matter, this Court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'"  Lockyer, 538 U.S. at 71, *quoting* 28 U.S.C. § 2254(d)(1).  In ascertaining "clearly established Federal law," the Court looks to the "holdings, as opposed to the dicta, of [Supreme Court] decisions as of the time of the relevant state-court decision."  Id., *quoting* Williams, 592 U.S. at 412.  "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision."  Id.

Finally, this Court must consider whether the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law."  Lockyer, 538 U.S. at 72, *quoting* 28 U.S.C. § 2254(d)(1).  "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts."  Williams, 529 U.S. at 413; *see also* Lockyer, 538 U.S. at 72.  "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  Williams, 529 U.S. at 413.

1   This Court may not issue the writ simply because in its independent judgment the state
2   court decision applied clearly established federal law erroneously or incorrectly; for a writ to
3   issue, 'that application must also be unreasonable." Id. at 411. A federal habeas court making
4   the "unreasonable application" inquiry should ask whether the state court's application of clearly
5   established federal law was 'objectively unreasonable." Id. at 409.

6   Petitioner has the burden of establishing that the decision of the state court is contrary to
7   or involved an unreasonable application of United States Supreme Court precedent. Baylor v.
8   Estelle, 94 F.3d 1321, 1325 (9th Cir. 1996). Although only Supreme Court law is binding on the
9   states, ninth circuit precedent remains relevant persuasive authority in determining whether a
10  state court decision is objectively unreasonable. *See* Duhaime v. DuCharme, 200 F.3d 597, 600-
11  01 (9th cir. 1999).

12  AEDPA requires that this court give considerable deference to state court decisions. The
13  state court's factual findings are presumed correct. 28 U.S.C. § 2254(e)(1). Moreover, we are
14  bound by a state's interpretation of its own laws. Souch v. Schaivo, 289 F.3d 616, 621 (9th Cir.
15  2002), *cert. denied*, 537 U.S. 859 (2002), *rehearing denied*, 537 U.S. 1149 (2003).

16  **III.  Review of Petitioner's Claim**

17  **A.    Petitioner's Claim that the Trial Court's Comments to the Jury During**
18  **Deliberations Amounted to Coercion of a Verdict**

19  Petitioner argues that the trial court's comments to the jury prior to excusing them for the
20  weekend during deliberations constituted jury coercion such that Petitioner's Due Process rights
21  were violated. Ex. G at 3, 6-9.

22  1.    Factual Background

23  [Trial began with jury selection on August 31, 1998. Jury deliberations began on Friday,
    September 25, 1998.] On Friday morning, October 2, 1998 the jury advised the court that it was
24  deadlocked at 10 to 2 on the count closest to verdict. The court polled the jury to see if it would
    be helpful to adjourn for the weekend and resume deliberation on Monday. Seven of the jurors
25  indicated continued deliberation would be beneficial. The jury was then given the option of
    continuing to deliberate the rest of Friday or adjourning until Monday. The jury decided to
26  continue.... That afternoon the jury again sent a note indicating it was deadlocked. The
    following then transpired:
27
      "Ladies and gentleman, I have received your note that I have marked as
28    Court Exhibit S. And it's indicating that you believe that you cannot reach a

unanimous decision in this case as to the two remaining defendants.  And it says at the end, 'Please advise us with further instructions.'  What does that mean?  What are you asking me?

"JUROR SEAT NUMBER FIVE: We're at a standstill and we don't know what the procedure is beyond that.

"THE COURT: All right.  Do you believe that anybody is not deliberating, in other words, they're refusing to deliberate?

"JUROR SEAT NUMBER FIVE: No.

"THE COURT: So from your standpoint it is simply a matter of a disagreement as to result?

"JUROR SEAT NUMBER FIVE: Yes.

"THE COURT: And let me again ask, what is the numerical breakdown, it makes no difference which way, I'm simply asking the charge or the count and the Defendant that is closest to a verdict, what is the count, just numerical only?

"JUROR SEAT NUMBER FIVE: 11 TO 1.

"THE COURT: All right.  This Court is going to exercise its discretion with regard to that.  That's very close to a verdict count-wise.  Whether it is for guilt or not guilt is not the issue.  The issue is that it's very close to a verdict, at least on one count at least on one Defendant.  The Court further indicates something that I indicated earlier, and that is, that you have worked long and hard obviously and you are – you couldn't possibly be anything but emotionally drained and intellectually exhausted.  Therefore, the Court is going to implement its discretion and I am going to send you home for the weekend to rest.  And I would ask you to come back – you tell me what time on Monday.

"MR. NICHOLS:[2] We would object to that, your Honor.

"THE COURT: I'm not interested in objections.  I am asking you to go home and rest.  And when you come back on Monday I'm going to ask you to go back in and continue your deliberations and see if the rest, physical, emotional and intellectual rest helps you to further your efforts at reaching a verdict.  And if it does, fine.  If it doesn't, it doesn't.  But I think that you're closer to a verdict now th[a]n you were the last time you were in the courtroom.  That doesn't mean you have a verdict, it just means you are closer numerically.  And, as I indicated, what that verdict is is not the concern to me, the concern is if we can reach a verdict we reach a verdict.

"What time would you like to come back on Monday morning?

"JUROR SEAT NUMBER FIVE: 9:00

"THE COURT: Anybody object to nine o'clock?

"(No response.)

"THE COURT: All right.  This weekend obviously there are more opportunities for people to ask you questions, to have you do research, such as, look words up, it's extraordinarily important that you do nothing with regard to this case over the weekend.  This is not a time that you can do more on the case, this is a time when you can do nothing on the case.  And I would ask you to be back in the jury room ready to proceed.  And please keep in mind that no matter what side of the numbers you are on, that makes no difference, but it is extraordinarily important that you keep your minds open to other people's opinions no matter what those opinions are, and that you not dig in your he[e]ls at this present time, no matter what side of the numbers you are on, and that you be open and receptive to discussion and perhaps the rest will allow you to be able to do that on Monday morning.

"Any questions?

"(No response.)

---

[2] Mr. Nichols represented one of Petitioner's co-defendants.

7

1    "THE COURT: All right. Have a restful weekend...."

2    After the jury retired, Mr. Nichols was allowed to make a record of his objection. He objected that sending the jurors home for the weekend with out first inquiring as to their position amounted to undue influence and coercion.

### 2. Clearly Settled Supreme Court Law

A criminal defendant has the constitutional right to a trial by an impartial jury, due process of law, and a reliable determination of guilt. U.S. Const. Amends. VI, XIV. In the habeas context, the Supreme Court rejects *per se* rules declaring certain judicial statements to be coercive. See Early v. Packer, 537 U.S. 3, 9-10 (2002), (holding that the Jenkins *per se* rule is irrelevant in the §2254(d)(1) context, as Jenkins reversed convictions in a *federal* prosecution based on the Court's supervisory powers rather than a declaring a rule of constitutional magnitude). Instead, the allegedly coercive judicial comment must be viewed "in its context and under all the circumstances." Lowenfield v. Phelps, 484 U.S. 231, 237 (1988) (citing Allen v. United States, 164 U.S. 492 (1896) for the proposition that the use of a supplemental charge has "long been sanctioned."); see also Cupp v. Naughten, 414 U.S. 141, 146-147 (1973) (No *per se* constitutional error for use of particular jury instruction. Instruction must be viewed in context of all instructions to determine if defendant was deprived of a fair trial).

### 3. State Court Analysis

The Fifth DCA rejected Petitioner's claim that the trial judge's comments had improperly coerced the jury into rendering guilty verdicts.

The Fifth DCA found that the trial court did not indicate that a verdict had to be reached. Ex. D at 11. Nor did it threaten to lengthen deliberations to insure one was reached. Id. Instead it simply asked the jurors to rest over the weekend and return with minds open to the other jurors' opinions. Id. (citing California law as well as Lowenfield v. Phelps, 484 U.S. 231, 235, for the proposition that an instruction to consider the views of other jurors is constitutionally permissible). In particular, the trial court did not urge the minority to give any special attention to the majority view, and did not suggest that a verdict had to be reached when the jurors returned on Monday. Id.

The Fifth DCA then addressed the trial court's refusal to entertain objections from

defense counsel while addressing the jury. Citing California law, it noted that there was no error under similar circumstances (where the court declined to entertain a question from a juror). Id. at 11-12. The Fifth DCA found that it was a proper exercise of extreme caution when dealing with a deadlocked juror to require counsel to wait until the jury was no longer present to voice any objections. Id. at 12.

Finally, the Fifth DCA noted that the circumstances of the jury deliberations after the complained-of instructions were not indicative of coercive effects. Upon returning, the jury continued to deliberate for two more days. Nor did the jury actually achieve unanimity on all counts against all defendants, returning no verdicts with regard to certain charges against codefendant Diamond. Id. Citing California law, the Fifth DCA held that nothing in the trial court's comments to the jury could properly be construed as an attempt to pressure the jury into reaching a verdict. The trial court had merely correctly concluded that there was a reasonable probability the jurors could agree on a verdict. Id.

4.      Analysis of Petitioner's Claim

We find that the decision of the Fifth DCA is not unreasonable in light of settled Supreme Court precedent. First, Petitioner's reliance on Jenkins is misplaced. Jenkins has been held to be irrelevant in the habeas context, as it reversed convictions in a *federal* prosecution based on considerations not of constitutional magnitude. See Early v. Packer, 537 U.S. 3, 9-10 (2002). Even if Jenkins *were* applicable, however, it would still afford Petitioner no relief. In Jenkins, the trial court had instructed the jury that "You have got to reach a decision in this case." Jenkins, 380 U.S. at 446. The trial court made no such demands of the jury in this case.

Petitioner also cites to United States v. Mason, 658 F.2d 1263, 1265-66 (9th Cir. 1981) and Allen v. United States, 164 U.S. 494, 501-502 (1896) in support of its argument. However, the comments made to the jurors in this case were less coercive even than those held permissible in Allen, let alone those found improper in Mason. The trial court did not indicate that a verdict had to be reached. The court likewise did not threaten to lengthen deliberations to ensure a verdict. The court asked jurors to rest over the weekend, to keep their minds open to the other jurors' opinions, and to be receptive to discussion. Instructing the jury to consider one another's

1  views is a permissible practice.  See Allen 164 U.S. at 501; see also Lowenfield v. Phelps, 484
2  U.S. 231, 235 (1988).  Unlike in Allen, the trial court did not even go so far as to urge the
3  minority juror to give special heed to the majority view.  The court noted that if a weekend of rest
4  helps, "fine.  If it doesn't, it doesn't."  These comments are not demonstrative of jury coercion.

5  Granted the trial court did poll the jury during deliberations, a practice that has been
6  frowned upon in federal courts.  However, the Supreme Court has held that jury polling is not a
7  *per se* violation of a defendant's Constitutional rights.  See Lowenfield, 484 U.S. at 239-240, fn.
8  3 (1998) ("Our decision in Brasfield makes no mention of the Due Process Clause or any other
9  constitutional provision.  The Federal Courts of Appeals have uniformly rejected the notion that
10 Brasfield's *per se* reversal approach must be followed when reviewing state proceedings on
11 habeas corpus. (citations).).  Instead, the critical question with respect to jury balloting – and
12 indeed with respect to *any* jury instructions – is whether the judge's questions and statements
13 "would be likely to coerce certain jurors into relinquishing their views in favor of reaching a
14 unanimous decision." Locks v. Sumner, 703 F.2d 403, 406 (9th Cir. 1983).  This inquiry must
15 occur in its context, not in isolation.  Id. 406-407.  In Locks, no coercion was found despite jury
16 balloting because the trial court "did not ask whether the jurors in the majority were for acquittal
17 or a guilty verdict; the judge did not follow the inquiry with any statement imploring the jury to
18 come to a decision; and the jury was not sent back to continue deliberations, but was dismissed
19 for the weekend." Id. at 407.

20 The Fifth DCA's finding that the trial court's comments to the jury did not amount to
21 coercion is not unreasonable in light of this precedent.  As in Locks, the trial court here inquired
22 as to the numerical division of jurors, but it expressly stated that it was not interested in knowing
23 whether the majority favored acquittal or conviction.  Nor did the trial court in this case attempt
24 to ascertain the identity of any hold-out jurors.  And the jurors were not sent back to deliberate
25 following the instructions, but were dismissed for the weekend.

26 Finally, the behavior of the jury following the trial court's comments is not indicative of
27 coercion.  Rather than returning from the weekend break with a quick verdict, the jurors
28 continued to deliberate for two days, not returning a verdict until the afternoon of Tuesday,

1  October 6.  (CT 1174; RT 4419).  Moreover, there remained a lack of unanimity with regard to
2  certain charges both against Petitioner and his codefendant.
3        Based on the foregoing, the state court rejection of Petitioner's claim was not contrary to
4  or an unreasonable application of clearly settled Supreme Court precedent.  See 28 U.S.C. §
5  2254(d).  Therefore the petition should be denied.

## RECOMMENDATION

7        Accordingly, the Court HEREBY RECOMMENDS that the petition for writ of habeas
8  corpus be DENIED and the Clerk of the Court be DIRECTED to enter judgment.
9        These Findings and Recommendations are submitted to the Honorable Lawrence J.
10  O'Neill, United States District Court Judge, pursuant to the provisions of 28 U.S.C. section 636
11  (b)(1)(B) and Rule 72-304 of the Local Rules of Practice for the United States District Court,
12  Eastern District of California.
13        Within thirty (30) days after being served with a copy, any party may file written
14  objections with the court and serve a copy on all parties.  Such a document should be captioned
15  "Objections to Magistrate Judge's Findings and Recommendations."  Replies to the objections
16  shall be served and filed within ten (10) court days (plus three days if served by mail) after
17  service of the objections.  The Court will then review the Magistrate Judge's ruling pursuant to
18  28 U.S.C. § 636 (b)(1)(c).  The parties are advised that failure to file objections within the
19  specified time may waive the right to appeal the District Court's order.  Martinez v. Y1st, 951
20  F.2d 1153 (9th Cir. 1991).

23  IT IS SO ORDERED.
24  **Dated:   July 24, 2007**                    **/s/ John M. Dixon**
                                                           UNITED STATES MAGISTRATE JUDGE